## Edwards et al. v. Sims, Judge.

(Decided December 3, 1929.)

RODES & HARLIN and GUY H. HERDMAN for petitioners.

JOHN E. RICHARDSON and J. WOOD VANCE for respondent.

OPINION BY COMMISSIONER STANLEY—Denying writ of prohibition.

This case presents a novel question.

In the recent case of Edwards v. Lee, 230 Ky. 375, 19 S. W. (2d) 992, an appeal was dismissed which sought a review and reversal of an order of the Edmonson circuit court directing surveyors to enter upon and under the lands of Edwards and others and survey the Great Onyx Cave for the purpose of securing evidence on an issue as to whether or not a part of the cave being exploited and shown by the appellants runs under the ground of Lee. The nature of the litigation is stated in the opinion and the order set forth in full. It was held that the order was interlocutory and consequently one from which no appeal would lie.

Following that decision, this original proceeding was filed in this court by appellants in that case (who were defendants below) against Hon. N. P. Sims, judge of the Edmonson circuit court, seeking a writ of prohibition to prevent him enforcing the order and punishing the petitioners for contempt for any disobedience of it. It is alleged by the petitioners that the lower court was without jurisdiction or authority to make the order, and that their cave property and their right of possession and privacy will be wrongfully and illegally invaded, and that they will be greatly and irreparably injured and damaged without having an adequate remedy, since the damage will have been suffered before there can be an adjudication of their rights on a final appeal. It will thus be seen that there are submitted the two grounds upon which this court will prohibit inferior courts from

proceeding, under the provisions of section 110 of the Constitution, namely: (1) Where it is a matter in which it has no jurisdiction and there is no remedy through appeal, and (2) where the court possesses jurisdiction but is exercising or about to exercise its power erroneously, and which would result in great injustice and irreparable injury to the applicant, and there is no adequate remedy by appeal or otherwise. Duffin v. Field, Judge, 208 Ky. 543, 271 S. W. 596; Potter v. Gardner, 222 Ky. 487, 1 S. W. (2d) 537; Litteral v. Woods, 223 Ky. 582, 4 S. W. (2d) 395.

1. There is no question as to the jurisdiction of the parties and the subject-matter. It is only whether the court is proceeding erroneously within its jurisdiction in entering and enforcing the order directing the survey of the subterranean premises of the petitioners. There is but little authority of particular and special application to caves and cave rights. In few places, if any, can be found similar works of nature of such grandeur and of such unique and marvelous character as to give to caves a commercial value sufficient to cause litigation as those peculiar to Edmonson and other counties in Kentucky. The reader will find of interest the address on "The Legal Story of Mammoth Cave" by Hon. John B. Rodes, of Bowling Green, before the 1929 Session of the Kentucky State Bar Association, published in its proceedings. In Cox v. Colossal Cavern Co., 210 Ky. 612, 276 S. W. 540, the subject of cave rights was considered, and this court held there may be a severance of the estate in the property, that is, that one may own the surface and another the cave rights, the conditions being quite similar to but not exactly like those of mineral lands. But there is no such severance involved in this case, as it appears that the defendants are the owners of the land and have in it an absolute right.

*Cujus est solum, ejus est usque ad coelum ad infernos* (to whomsoever the soil belongs, he owns also to the sky and to the depths), is an old maxim and rule. It is that the owner of realty, unless there has been a division of the estate, is entitled to the free and unfettered control of his own land above, upon and beneath the surface. So whatever is in a direct line between the surface of the land and the center of the earth belongs to the owner of the surface. Ordinarily that ownership cannot be interfered with or infringed by third persons.

17 C. J. 391; 22 R. C. L. 56; Langhorne v. Turman, 141 Ky. 809, 133 S. W. 1008, 34 L. R. A. (N. S.) 211. There are, however, certain limitations on the right of enjoyment of possession of all property, such as its use to the detriment or interference with a neighbor and burdens which it must bear in common with property of a like kind. 22 R. C. L. 77.

With this doctrine of ownership in mind, we approach the question as to whether a court of equity has a transcendent power to invade that right through its agents for the purpose of ascertaining the truth of a matter before it, which fact thus disclosed will determine certainly whether or not the owner is trespassing upon his neighbor's property. Our attention has not been called to any domestic case, nor have we found one, in which the question was determined either directly or by analogy. It seems to the court, however, that there can be little differentiation, so far as the matter now before us is concerned, between caves and mines. And as declared in 40 C. J. 947:

> "A court of equity, however, has the inherent power, independent of statute, to compel a mine owner to permit an inspection of his works at the suit of a party who can show reasonable ground for suspicion that his lands are being trespassed upon through them, and may issue an injunction to permit such inspection."

There is some limitation upon this inherent power, such as that the person applying for such an inspection must show a bona fide claim and allege facts showing a necessity for the inspection and examination of the adverse party's property; and, of course, the party whose property is to be inspected must have had an opportunity to be heard in relation thereto. In the instant case it appears that these conditions were met. The respondent cites several cases from other jurisdictions in which this power has been recognized and exercised. A leading case very much in point is that of Montana Co. v. St. Louis Mining & Milling Co., 152 U. S. 160, 14 S. Ct. 506, 508, 38 L E. 398. In that case there was involved the validity of a Missouri statute authorizing the inspection, examination, and surveying of mining property of another, when necessary to protect, ascertain, or enforce the right or interest of any person owning a mining claim. Reasoning the question as to

whether the statute deprived the owner of his property without due process of law, it is said by Mr. Justice Brewer in the opinion:

"On the other hand, while not decisive of the question, the frequency with which these orders of inspection have of late years been made, and the fact that the right to make them has never been denied by the courts, is suggestive that there is no inherent vice in them; and if the courts of equity, by virtue of their general powers, may rightfully order such an inspection in a case pending before them, surely it is within the power of a state, by statute, to provide the manner and conditions of such an inspection in advance of the suit. To 'establish justice' is one of the objects of all social organizations, as well as one of the declared purposes of the federal Constitution; and if, to determine the exact measure of the rights of parties, it is necessary that a temporary invasion of the possession of either for purposes of inspection be had, surely the lesser evil of a temporary invasion of one's possession should yield to the higher good of establishing justice; and any measures or proceedings which, having the sanction of law, provide for such temporary invasion with the least injury and inconvenience, should not be obnoxious to the charge of not being due process of law.

"Passing from these general suggestions to some of a more special character, it must be remembered that inspection does not deprive the owner of the title to any portion of his property, nor does it deprive him permanently of the use. The property, therefore, is not taken in the sense that he no longer remains the owner, nor in the sense that the permanent use of the property has been appropriated. In Pumpelly v. Canal Co., Green Bay Company, 13 Wall. 166 (20 L. Ed. 557), it was held that, if a party is deprived of the entire use of his property, it is a taking, within the scope of the fifth amendment, although the mere title is not disturbed; but by an inspection neither the title nor the general use is taken, and all that can be said is that there is a temporary and limited interruption of the exclusive use; and it is in that light that the question of the validity of this statute is to be determined."

Further considering the issue, and of pertinence to criticism of the order involved in the case now before us, the opinion continues:

"In conclusion, it may be observed that courts of equity have, in the exercise of their inherent powers, been in the habit of ordering inspections of property, as of requiring the production of books and papers; that this power on the part of such courts has never been denied, and, if it exists, a fortiori the state has power to provide a statutory proceeding to accomplish the same result; that the proceeding provided by this statute requires notice to the defendant, of a hearing and an adjudication before the court or judge; that it permits no removal or appropriation of any property, nor any permanent dispossession of its use, but is limited to such temporary and partial occupation as is necessary for a mere inspection; that there is a necessity for such proceeding, in order that justice may be exactly administered; that this statute provides all reasonable protection to the party against whom the inspection is ordered; that the failure to require a bond, or to provide an appeal, or to have the question of title settled before a jury, is not the omission of matters essential to due process of law."

The Supreme Court of Kansas, in Culbertson v. Iola Portland Cement Co., etc., 87 Kan. 529, 125 P. 81, 82, Ann. Cas. 1914A, 610, sustained a similar order even though there was no specific statutory authority to do so; the court saying:

"It is contended that there was no authority for ordering or making such an inspection, and that those acting under it would, in fact, be committing a trespass. There is no specific statutory authority for the order; but such orders have been made by courts of equity from the beginning. It may be done where there is a real necessity for inspection, or where the facts to be determined cannot well be determined by the ordinary methods. . . .

"Inspection is frequently ordered in mining cases; but the power is exercised to assist in determining the value of buildings and to ascertain other essential facts."

We can see no difference in principle between the invasion of a mine on adjoining property to ascertain whether or not the minerals are being extracted from under the applicant's property and an inspection of this respondent's property through his cave to ascertain whether or not he is trespassing under this applicant's property.

It appears that before making this order the court had before him surveys of the surface of both properties and the conflicting opinions of witnesses as to whether or not the Great Onyx Cave extended under the surface of the plaintiff's land. This opinion evidence was of comparatively little value, and as the chancellor (now respondent) suggested, the controversy can be quickly and accurately settled by surveying the cave; and "if defendants are correct in their contention this survey will establish it beyond all doubt and their title to this cave will be forever quieted. If the survey shows the Great Onyx Cave extends under the lands of plaintiffs, defendants should be glad to know this fact and should be just as glad to cease trespassing upon plaintiff's lands, if they are in fact doing so." The peculiar nature of these conditions, it seems to us, makes it imperative and necessary in the adminstration of justice that the survey should have been ordered and should be made.

It appearing that the circuit court is not exceeding its jurisdiction or proceeding erroneously, the claim of irreparable injury need not be given consideration. It is only when the inferior court is acting erroneously, and great or irreparable damage will result, and there is no adequate remedy by appeal, that a writ of prohibition will issue restraining the other tribunal, as held by authorities cited above.

The writ of prohibition is therefore denied.

Whole court sitting.

### DISSENTING OPINION BY JUDGE LOGAN.

The majority opinion allows that to be done which will prove of incalculable injury to Edwards without benefiting Lee, who is asking that this injury be done. I must dissent from the majority opinion, confessing that I may not be able to show, by any legal precedent, that the opinion is wrong, yet having an abiding faith in my own judgment that it is wrong.

It deprives Edwards of rights which are valuable, and perhaps destroys the value of his property, upon the motion of one who may have no interest in that which it takes away, and who could not subject it to his dominion or make any use of it, if he should establish that which he seeks to establish in the suit wherein the survey is sought.

It sounds well in the majority opinion to tritely say that he who owns the surface of real estate, without reservation, owns from the center of the earth to the outmost sentinel of the solar system. The age-old statement, adhered to in the majority opinion as the law, in truth and fact, is not true now and never has been. I can subscribe to no doctrine which makes the owner of the surface also the owner of the atmosphere filling illimitable space. Neither can I subscribe to the doctrine that he who owns the surface is also the owner of the vacant spaces in the bowels of the earth.

The rule should be that he who owns the surface is the owner of everything that may be taken from the earth and used for his profit or happiness. Anything which he may take is thereby subjected to his dominion, and it may be well said that it belongs to him. I concede the soundness of that rule, which is supported by the cases cited in the majority opinion; but they have no application to the question before the court in this case. They relate mainly to mining rights; that is, to substances under the surface which the owner may subject to his dominion. But no man can bring up from the depths of the earth the Stygian darkness and make it serve his purposes; neither can he subject to his dominion the bottom of the ways in the caves on which visitors tread, and for these reasons the owner of the surface has no right in such a cave which the law should, or can, protect because he has nothing of value therein, unless, perchance, he owns an entrance into it and has subjected the subterranean passages to his dominion.

A cave or cavern should belong absolutely to him who owns its entrance, and this ownership should extend even to its utmost reaches if he has explored and connected these reaches with the entrance. When the surface owner has discovered a cave and prepared it for purposes of exhibition, no one ought to be allowed to disturb him in his dominion over that which he has conquered and subjected to his uses.

It is well enough to hang to our theories and ideas, but when there is an effort to apply old principles to present-day conditions, and they will not fit, then it becomes necessary for a readjustment, and principles and facts as they exist in this age must be made conformable. For these reasons the old sophistry that the owner of the surface of land is the owner of everything from zenith to nadir must be reformed, and the reason why a reformation is necessary is because the theory was never true in the past, but no occasion arose that required the testing of it. Man had no dominion over the air until recently, and, prior to his conquering the air, no one had any occasion to question the claim of the surface owner that the air above him was subject to his dominion. Naturally the air above him should be subject to his dominion in so far as the use of the space is necessary for his proper enjoyment of the surface, but further than that he has no right in it separate from that of the public at large. The true principle should be announced to the effect that a man who owns the surface, without reservation, owns not only the land itself, but everything upon, above, or under it which he may use for his profit or pleasure, and which he may subject to his dominion and control. But further than this his ownership cannot extend. It should not be held that he owns that which he cannot use and which is of no benefit to him, and which may be of benefit to others.

Shall a man be allowed to stop airplanes flying above his land because he owns the surface? He cannot subject the atmosphere through which they fly to his profit or pleasure; therefore, so long as airplanes do not injure him or interfere with the use of his property, he should be helpless to prevent their flying above his dominion. Should the waves that transmit intelligible sound through the atmosphere be allowed to pass over the lands of surface-owners? If they take nothing from him and in no way interfere with his profit or pleasure, he should be powerless to prevent their passage?

If it be a trespass to enter on the premises of the landowner, ownership meaning what the majority opinion holds that it means, the aviator who flies over the land of one who owns the surface, without his consent, is guilty of trespass as defined by the common law and is subject to fine or imprisonment, or both, in the discretion of a jury.

If he who owns the surface does not own and control the atmosphere above him, he does not own and control vacuity beneath the surface. He . owns everything beneath the surface that he can subject to his profit or pleasure, but he owns nothing more. Therefore, let it be written that a man who owns land does, in truth and in fact, own everything from zenith to nadir, but only for the use that he can make of it for his profit or pleasure. He owns nothing which he cannot subject to his dominion.

In the light of these unannounced principles which ought to be the law in this modern age, let us give thought to the petitioner Edwards, his rights and his predicament, if that is done to him which the circuit judge has directed to be done. Edwards owns this cave through right of discovery, exploration, development, advertising, exhibition, and conquest. Men fought their way through the eternal darkness, into the mysterious and abysmal depths of the bowels of a groaning world to discover the theretofore unseen splendors of unknown natural scenic wonders. They were conquerors of fear, although now and then one of them, as did Floyd Collins, paid with his life, for his hardihood in adventuring into the regions where Charon with his boat had never before seen any but the spirits of the departed. They let themselves down by flimsy ropes into pits that seemed bottomless; they clung to scanty handholds as they skirted the brinks of precipices while the flickering flare of their flaming flambeaux disclosed no bottom to the yawning gulf beneath them; they waded through rushing torrents, not knowing what awaited them on the farther side; they climbed slippery steeps to find other levels; they wounded their bodies on stalagmites and stalactites and other curious and weird formations; they found chambers, star-studded and filled with scintillating light reflected by a phantasmagoria revealing fancied phantoms, and tapestry woven by the toiling gods in the dominion of Erebus; hunger and thirst, danger and deprivation could not stop them. Through days, weeks, months, and years—ever linking chamber with chamber, disclosing an underground land of enchantment, they continued their explorations; through the years they toiled connecting these wonders with the outside world through the entrance on the land of Edwards which he had discovered; through the years they toiled finding safe ways for those who might come to view what they had found

and placed their seal upon. They knew nothing, and cared less, of who owned the surface above; they were in another world where no law forbade their footsteps. They created an underground kingdom where Gulliver's people may have lived or where Ayesha may have found the revolving column of fire in which to bathe meant eternal youth.

When the wonders were unfolded and the ways were made safe, then Edwards patiently, and again through the years, commenced the advertisement of his cave. First came one to see, then another, then two together, then small groups, then small crowds, then large crowds, and then the multitude. Edwards had seen his faith justified. The cave was his because he had made it what it was, and without what he had done it was nothing of value. The value is not in the black vacuum that the uninitiated call a cave. That which Edwards owns is something intangible and indefinable. It is his vision translated into a reality.

Then came the horse leach's daughters crying: "Give me," "give me." Then came the "surface men" crying, "I think this cave may run under my lands." They do not know they only "guess," but they seek to discover the secrets of Edwards so that they may harass him and take from him that which he has made his own. They have come to a court of equity and have asked that Edwards be forced to open his doors and his ways to them so that they may go in and despoil him; that they may lay his secrets bare so that others may follow their example and dig into the wonders which Edwards has made his own. What may be the result if they stop his ways? They destroy the cave, because those who visit it are they who give it value, and none will visit it when the ways are barred so that it may not be exhibited as a whole.

It may be that the law is as stated in the majority opinion of the court, but equity, according to my judgment, should not destroy that which belongs to one man when he at whose behest the destruction is visited, although with some legal right, is not benefited thereby. Any ruling by a court which brings great and irreparable injury to a party is erroneous.

For these reasons I dissent from the majority opinion.