## Edwards et al. v. Lee's Adm'r et al.
(Decided June 5, 1936.)

WOODWARD, DAWSON & HOBSON, M. M. LOGAN and LOGAN & LOGAN for appellants.

JOHN E. RICHARDSON, RICHARD P. DIETZMAN and J. WOOD VANCE for appellees.

OPINION OF THE COURT BY JUDGE STITES—Affirming in part and reversing in part.

This is an appeal from a judgment of the Edmonson circuit court sitting in equity. Appellants argue but two points in this court: (1) That the court below applied an improper measure of damages; and (2) even if the measure of damages was correct, the amount was erroneously computed. Due to the unique nature of the case, a somewhat detailed statement of the facts is necessary.

About twenty years ago L. P. Edwards discovered a cave under land belonging to him and his wife, Sally Edwards. The entrance to the cave is on the Edwards land. Edwards named it the "Great Onyx Cave," no doubt because of the rock crystal formations within it which are known as onyx. This cave is located in the cavernous area of Kentucky, and is only about three miles distant from the world-famous Mammoth Cave. Its proximity to Mammoth Cave, which for many years has had an international reputation as an underground wonder, as well as its beautiful formations, led Edwards to embark upon a program of advertising and exploitation for the purpose of bringing visitors to his cave. Circulars were printed and distributed, signs were erected along the roads, persons were employed and stationed along the highways to solicit the patronage of passing travelers, and thus the fame of the Great Onyx Cave spread from year to year, until eventually, and before the beginning of the present litigation, it was a well-

known and well-patronized cave. Edwards built a hotel near the mouth of the cave to care for travelers. He improved and widened the footpaths and avenues in the cave, and ultimately secured a stream of tourists who paid entrance fees sufficient not only to cover the cost of operation, but also to yield a substantial revenue in addition thereto. The authorities in charge of the development of the Mammoth Cave area as a national park undertook to secure the Great Onyx Cave through condemnation proceedings, and in that suit the value of the cave was fixed by a jury at $396,000. In April, 1928, F. P. Lee, an adjoining landowner, filed this suit against Edwards and the heirs of Sally Edwards, claiming that a portion of the cave was under his land, and praying for damages, for an accounting of the profits which resulted from the operation of the cave, and for an injunction prohibiting Edwards and his associates from further trespassing upon or exhibiting any part of the cave under Lee's land. At the inception of this litigation, Lee undertook to procure a survey of the cave in order that it might be determined what portion of it was on his land. The chancellor ordered that a survey be made, and Edwards prosecuted an appeal from that order to this court. The appeal was dismissed because it was not from a final judgment. Edwards v. Lee, 230 Ky. 375, 19 S. W. (2d) 992. Thereupon Edwards sought a writ of prohibition in this court against the circuit judge to prevent the carrying out of the order of survey. The writ was denied. Edwards v. Sims, 232 Ky. 791, 24 S. W. (2d) 619, 620. In this last case the maxim, "Cujus est solum, ejus est usque ad cœlum et ad infernos" (to whomsoever the soil belongs, he owns also to the sky and to the depths) was considered and applied, and an analogy drawn between trespassing through mining beneath another's land and passing under it through a cave. A tremendous amount of proof was taken on each side concerning the title of Lee to the land claimed by him; how much, if any, of the cave is under the land of Lee; the length of the exhibited portion of the cave and the amount thereof under the land of Lee; the net earnings of the cave for the years involved; the location of the principal points of interest in the cave and whether they were under the lands of Edwards or of Lee; and whether or not Edwards and his associates had knowledge of the fact that they were trespassing on Lee's property. An appeal was taken to this court from

a judgment fixing the boundaries between the lands of Edwards and Lee, and that judgment was affirmed. Edwards v. Lee, 250 Ky. 166, 61 S. W. (2d) 1049. An injunction was granted prohibiting Edwards and his associates from further trespassing on the lands of Lee. On final hearing the chancellor stated separately his findings of law and of fact in the following language:

"The Court finds as a matter of law the plaintiff is entitled to recover of defendants the proportionate part of the net proceeds defendants received from exhibiting Great Onyx Cave from the years 1923 to 1930, inclusive, as the footage of said cave under Lee's land bears to the entire footage of the cave exhibited to the public for fees during the years 1923 to 1930, inclusive, with 6% interest on plaintiff's proportionate part of said fund for each year from the first day of the following year as set out in the memorandum opinion.

"1. The Court finds as a matter of fact the true boundary line between the Lee and Edwards land is as set out in a former judgment of this Court in this case which was affirmed in Edwards v. Lee, 250 Ky. 166, 61 S. W. (2d) 1049.

"2. The Court finds as a matter of fact there was 6,449.88 feet of said cave exhibited to the public during 1923 to 1930, inclusive, and that 2,048.60 feet of said footage was under Lee's lands making plaintiff entitled to $\frac{2048.60,}{6449.88}$ or 1/3 of the proceeds.

"3. The Court finds as a matter of fact the proof failed to show the proceeds received for the years 1923 and 1924 and there can be no recovery for those years. That the net proceeds for 1925 amounted to $3,090.31 and plaintiff's one-third thereof is $1,030.10, with 6% interest from January 1st, 1926, and that the net proceeds for the other years were:

| 1926 | $ 4,039.56 |
| 1927 | 7,288.57 |
| 1928 | 14,632.99 |
| 1929 | 24,551.96 |
| 1930 | 23,340.51 |

"and the plaintiffs are entitled to one-third of the net

proceeds for each of said years, with 6% interest thereon from January 1st of each succeeding year."

Appellants, in their attack here on the measure of damages and its application to the facts adduced, urge: (1) That the appellees had simply a hole in the ground, about 360 feet below the surface, which they could not use and which they could not even enter except by going through the mouth of the cave on Edwards' property; (2) the cave was of no practical use to appellees without an entrance, and there was no one except the appellants on whom they might confer a right of beneficial use; (3) Lee's portion of the cave had no rental value; (4) appellees were not ousted of the physical occupation or use of the property because they did not and could not occupy it; (5) the property has not in any way been injured by the use to which it has been put by appellants, and since this is fundamentally an action for damages arising from trespass, the recovery must be limited to the damages suffered by appellees (in other words, nominal damages) and cannot properly be measured by the benefits accruing to the trespasser from his wrongful use of the property; (6) as a result of the injunction, appellees have their cave in exactly the condition it has always been, handicapped by no greater degree of uselessness than it was before appellants trespassed upon it.

Appellees, on the other hand, argue that this was admittedly a case of willful trespass; that it is not analogous to a situation where a trespasser simply walks across the land of another, for here the trespasser actually used the property of Lee to make a profit for himself; that even if nothing tangible was taken or disturbed in the various trips through Lee's portion of the cave, nevertheless there was a taking of esthetic enjoyment which, under ordinary circumstances, would justify a recovery of the reasonable rental value for the use of the cave; that there being no basis for arriving at reasonable rental values, the chancellor took the only course open to him under the circumstances and properly assessed the damages on the basis of the profits realized from the use of Lee's portion of the cave. Appellees have taken a cross-appeal, however, on the theory that, since the trespass was willful, their damages should be measured by the gross profits realized from

the operation of the cave rather than from its net profits.

As the foregoing statement of the facts and the contentions of the parties will demonstrate, the case is sui generis, and counsel have been unable to give us much assistance in the way of previous decisions of this or other courts. We are left to fundamental principles and analogies.

We may begin our consideration of the proper measure of damages to be applied with the postulate that appellees held legal title to a definite segment of the cave and that they were possessed, therefore, of a right which it is the policy of the law to protect. We may assume that the appellants were guilty of repeated trespasses upon the property of appellees. So much was in effect determined when the case was here before on the appellants' application for a writ of prohibition. Edwards v. Sims, 232 Ky. 791, 24 S. W. (2d) 619. The proof likewise clearly indicates that the trespasses were willful, and not innocent.

Appellees brought this suit in equity, and seek an accounting of the profits realized from the operation of the cave, as well as an injunction against future trespass. In substance, therefore, their action is ex contractu and not, as appellants contend, simply an action for damages arising from a tort. Ordinarily, the measure of recovery in assumpsit for the taking and selling of personal property is the value received by the wrongdoer. On the other hand, where the action is based upon a trespass to land, the recovery has almost invariably been measured by the reasonable rental value of the property. Profile Cotton Mills v. Calhoun Water Co., 204 Ala. 243, 85 So. 284; Rector v. Lewis, 46 Cal. App 168, 188 P. 1018; Vandalia R. Co. v. Topping, 72 Ind. App. 694, 126 N. E. 485; Anderson v. Sutton, 308 Mo. 406, 275 S. W. 32; Van Wagoner v. Whitmore, 58 Utah, 418, 199 P. 670. Strictly speaking, a count for "use and occupation" does not fit the facts before us because, while there has been a recurring use, there has been no continuous occupation of the cave such as might arise from the planting of a crop or the tenancy of a house. Each trespass was a distinct usurpation of the appellees' title and interruption of their right to undisturbed possession. But, even if we apply the analogy of the

crop cases or the wayleave cases (Phillips v. Homfray, 24 Ch. Div. 439; Whithem v. Westminster Co., 12 Times L. R. 318; Carmichael v. Old Straight Creek Coal Corporation, 232 Ky. 133, 22 S. W. (2d) 572), it is apparent that rental value has been adopted, either consciously or unconsciously, as a convenient yardstick by which to measure the proportion of profit derived by the trespasser directly from the use of the land itself (9 R. C. L. 942). In other words, rental value ordinarily indicates the amount of profit realized directly from the land as land, aside from all collateral contracts.

That profits rather than rent form the basis of recovery is illustrated by the cases involving the question of when an action of this character survives against the personal representative of a wrongdoer. If rent alone were the basis of recovery, we would expect to find that the action would survive against the estate of the trespasser. It would certainly be reasonable to assume that a simple action for debt would lie and that this would survive. The rule, however, has been established to the contrary. In considering what actions survive against an estate, Lord Mansfield, in Hambly v. Trott, 1 Cowp. 371, said:

> "If it is a sort of injury by which the offender acquires no gain to himself, at the expense of the sufferer, as beating or imprisoning a man, &c., there, the person injured, has only a reparation for the delictum in damages to be assessed by a jury. But where, besides the crime, property is acquired which benefits the testator, there an action for the value of the property shall survive against the executor. As for instance, the executor shall not be chargeable for the injury done by his testator in cutting down another man's trees, but for the benefit arising to his testator for the value or sale of the trees he shall.

> "So far as the tort itself goes, an executor shall not be liable; and therefore it is, that all public and all private crimes die with the offender, and the executor is not chargeable; but so far as the act of the offender is beneficial, his assets ought to be answerable; and his executor therefore shall be charged."

In the leading case of Phillips v. Homfray, 24 Ch.

Div. 439, the plaintiffs were the owners of a farm, and the defendants had for some time past been working the minerals underlying lands adjoining plaintiffs' farm. Plaintiffs discovered that the defendants were not only getting minerals from under their farm, but were using roads and passages made by them through the plaintiffs' minerals for the conveyance of minerals gotten by the defendants from their own mines. An action was brought to recover for the minerals taken from under the plaintiffs' property, and also for damages to be paid as wayleave for the use of the roads and passages in transporting the minerals of the defendants across the property. One of the defendants having died, the question was presented as to whether either of these causes of action survived against his estate. The court held that this defendant's estate was liable in the action for the minerals taken because it had, to that extent, been enriched by the defendant's wrong. As to the recovery for wayleave, the court held that the action did not survive because nothing had been added to the defendant's estate through the use of the roads and passages under plaintiffs' land. The defendant had been saved expense in thus using the passages, but it was pointed out that this did not constitute an enrichment and that the action did not, therefore, survive. Other English cases in harmony with Hambly v. Trott and Phillips v. Homfray might be cited, but we deem these two to be sufficient to illustrate the principle. Clearly, the unjust enrichment of the wrongdoer is the gist of the right to bring an action ex contractu. Rental value is merely the most convenient and logical means for ascertaining what proportion of the benefits received may be attributed to the use of the real estate. In the final analysis, therefore, the distinction made between assumpsit concerning real and personal property thus disappears. In other words, in both situations the real criterion is the value received for the property, or for the use of the property, by the tort-feasor.

Similarly, in illumination of this conclusion, there is a line of cases holding that the plaintiff may at common law bring an action against a trespasser for the recovery of "mesne profits" following the successful termination of an action of ejectment. For example, see Capital Garage Co. v. Powell, 98 Vt. 303, 127 A. 375. Here again, the real basis of recovery is the profits re-

ceived, rather than rent. In Worthington v. Hiss, 70 Md. 172, 16 A. 534, 536, 17 A. 1026 (cited with approval in the Vermont case), the court said:

"It is well settled that in an action to recover mesne profits the plaintiff must show in the best way he can what those profits are, and there are two modes of doing so, to either of which he may resort,—he may either prove the profits actually received, or the annual rental value of the land. West v. Hughes, 1 Har. & J. [(Md.) 574] 576 [2 Am. Dec. 539]; Mitchell v. Mitchell, 10 Md. 234. The latter is the mode usually adopted. Where there is occupation of a farm or land used only for agricultural purposes, and the income and profits are of necessity the produce of the soil, the owner may have an account of the proceeds of the crops and other products sold or raised thereon, deducting the expense of cultivation. These are necessarily rents and profits in such cases, but even there it is more usual to arrive at the same result by charging the occupier, as tenant, with a fair annual money rent. McLaughlin v. Barnum, 31 Md. [425] 452. But the proprietor of city lots, with improvements upon them, can only derive therefrom, as owner, a fair occupation rent for the purposes for which the premises are adapted. This constitutes the rents and profits, in the legal sense of the terms, of such property, and is all the owner can justly claim in this shape from the occupier."

Finally, in the current proposed final draft of the Restatement of Restitution and Unjust Enrichment (March 4, 1936), Part 1, sec. 136, it is stated:

"A person who tortiously uses a trade name, trade secret, profit a prendre, or other similar interest of another, is under a duty of restitution for the value of the benefit thereby received."

The analogy between the right to protection which the law gives a trade-name or trade secret and the right of the appellees here to protection of their legal rights in the cave seems to us to be very close. In all of the mineral and timber cases, there is an actual physical loss suffered by the plaintiff, as well as a benefit received by the defendant. In other words, there is both a plus and a minus quantity. In the trade-name and

similar cases, as in the case at bar, there may be no tangible loss other than the violation of a right. The law, in seeking an adequate remedy for the wrong, has been forced to adopt profits received, rather than damages sustained, as a basis of recovery. In commenting on the section of the Restatement quoted above, the reporter says:

"Persons who tortiously use trade names, trade secrets, water rights, and other similar interests of others, are ordinarily liable in an action of tort for the harm which they have done. In some cases, however, no harm is done and in these cases if the sole remedy were by an action of tort the wrongdoer would be allowed to profit at little or no expense. In cases where the damage is more extensive, proof as to its extent may be so difficult that justice can be accomplished only by requiring payment of the amount of profits. Where definite damage is caused and is susceptible of proof, the injured person, as in other tort cases, can elect between an action for damages and an action for the value of that which was improperly received. The usual method of seeking restitution is by a bill in equity, with a request for an accounting for any profits which have been received, but the existence of a right to bring such a bill does not necessarily prevent an action at law for the value of the use. In the case of tortious interference with patents, under existing statutes there is a right to restitution only in connection with an injunction."

Whether we consider the similarity of the case at bar to (1) the ordinary actions in assumpsit to recover for the use and occupation of real estate, or (2) the common-law action for mesne profits, or (3) the action to recover for the tortious use of a trade-name or other similar right, we are led inevitably to the conclusion that the measure of recovery in this case must be the benefits, or net profits, received by the appellants from the use of the property of the appellees. The philosophy of all these decisions is that a wrongdoer shall not be permitted to make a profit from his own wrong. Our conclusion that a proper measure of recovery is net profits, of course, disposes of the cross-appeal. Appellees are not entitled to recover gross profits. They are limited to the benefits accruing to the appellants.

This brings us to a consideration of appellants' second contention, namely, that even if the measure of recovery was correct, the amount was erroneously computed. It is argued that the appellants ceased to exhibit the portion of the cave on appellees' land after electric lights were put into that part of the cave on appellants' property. The proof on this question was conflicting. Various witnesses testified concerning the particular points of interest that were exhibited, and many of these were shown to have been on appellees' land. Likewise, it was established that tourists entering the cave, even after it had been electrified to the limits of appellants' property, carried lanterns, which, presumably, would only be of use if they were going into its unlighted portions, and advertisements of the cave published after the electrification continued to feature points of interest on the appellees' land. Under the circumstances, therefore, we cannot say that the chancellor did not correctly conclude that the entire cave was exhibited even after the portion of it on appellants' land had been equipped with electric lights.

In determining the profits which might fairly be said to arise directly from the use of appellees' segment of the cave, the chancellor considered not only the footage exhibited, but the relative value of the particular points of interest featured in advertising the cave, and their possible appeal in drawing visitors. Of thirty-one scenes or objects in the cave advertised by appellants, twelve were shown to be on appellees' property. Several witnesses say that the underground Lucikovah river, which is under the appellees' land for almost its entire exhibited length, is one of the most attractive features of the cave, if not its leading attraction. Other similar attractions are shown to be located on appellees' property. The chancellor excluded profits received by the appellants from the operation of their hotel, and we think the conclusion that one-third of the net profits received alone from the exhibition of the cave is a fair determination of the direct benefits accruing to the appellants from the use of the appellees' property.

Finally, it is argued that the chancellor erroneously permitted the recovery of one-third of the profits for the entire year of 1930, when in fact the record shows that the appellants did not exhibit the entire cave dur-

ing the latter part of that year. Appellees, in their brief, do not dispute this contention, and, on the contrary, refer to the figure given by an audit showing the profits during the first six months of 1930. We think it may properly be assumed that a third of the net profits for the six months' period was derived from the use of appellees' segment of the cave, although it is argued that this portion of the cave was only exhibited for five months. Certainly it was advertised as an attraction during the entire year. It is evident that the chancellor simply overlooked this fact in going through the mass of figures contained in the ten volumes which make up the record, and that the base figure to be used in ascertaining appellees' one-third of the profits for the year 1930 should be $17,240.97 in lieu of the figure of $23,340.51 found in the judgment. The judgment is affirmed in part and reversed in part on the original appeal and affirmed on the cross-appeal.

Whole court sitting, except Judge Richardson, who took no part in the consideration or decision of this case.

Judge Thomas filed a separate concurring opinion.

Concurring opinion by Thomas, Justice.

I concur in the ultimate conclusion reached by my brethren as expressed in the majority opinion, but I differ widely from the reasoning employed therein as a basis for reaching it. In expressing my views as to the basis—or platform so to speak—upon which I think the judgment should rest, I will content myself with only mentioning universally known principles of the law without encumbering what I shall say with supporting opinions and text authorities, except where I deem it necessary to adopt a different course. If this were the majority opinion, I would feel it requisite throughout to fortify the legal propositions that I shall state with adjudicated cases and text authorities of recognized and undisputed reliability.

The opinion states the facts, and correctly concludes that "the case is sui generis." It then adds: "Counsel have been unable to give us much assistance in the way of previous decisions of this or other courts. We are left to fundamental principles and analogies." Those excerpts therefrom are undoubtedly true, and

some principle must be found by which (1) the involved property (the cave) may be rendered profitable to each of its several owners, and (2) that it may be kept open in its entirety; not only for the purpose of making each owner's portion profitable to him, and all others having proprietary rights therein, but also that the patronizing public might not be deprived of the educational and other benefits to be derived from visiting the nature-made wonder throughout its length, without any obstructing walls by separate segment owners, which under the theory of the opinion they would undoubtedly have the right to construct, provided they could gain entrance into the cave for that purpose.

It is because of the recognition of such segment ownership, as recognized and applied by the opinion, with its following consequences, that has led me to adopt the views hereinafter expressed, and which I am confident will be found to be not only the more practical, but also an assured guarantee is thereby furnished against the possible obstructions, already mentioned, and other potential consequences that lurk in the theory approved and adopted by the court's opinion. The case, being sui generis, with its peculiar facts having never heretofore been presented to a court for a declaration of rights growing out of similar conditions, must necessarily be determined upon equitable principles, formulated with the view of not only preserving the rights of owners, but also for maintaining those of the public, both of which I think are endangered and liable to become wholly destroyed if the declared basis of the opinion should be adhered to in any future state of facts wherein such obstructing activities should be employed. The opinion, according to my interpretation of it, recognizes the right of courts in such sui generis cases to employ a tool from the contents of its inexhaustible chest whereby a particular case may be fitted into the niche that it should occupy so as to preserve the rights of all persons concerned. That recognition is exhibited by the attempted differentiation of this case from an ordinary trespass action and to determine the rights of the parties on ex contractu principles. In doing so it regards as analogous the multiplied cases that have been determined wherein a trespasser on real estate takes away from the corpus a part of it, and which part so abstracted was the only source of profit involved—as for

example oil, gas, coal, and other tangible minerals. To the same effect are the cases wherein a trespasser takes away a part of the soil of another. In all such cases where the trespassing act is willfully done, the measure of recovery of the one trespassed upon is the net value of the substance taken away from the corpus of his property. On the other hand, where no corpus is abstracted and taken away, but only a mere use of the property, with the corpus left intact upon the cessation of the use, the measure of recovery is the reasonable rental value of the property.

I have yet to meet with a case where A would be made to account to B for all of the agricultural profits grown by A on B's land while the grower was an undoubted trespasser. The measure would be the damages that A did to B's land (all of which he would leave intact after the trespassing act ceased) and which is practically universally determined as being the rental value of the land for the use to which it was put. Other illustrations could be cited in substantiation of the same view and which illustrations are analogous to the one here involved, as is pointed out in the opinion. Manifestly that rule for the measure of damages in this case (and which is the one insisted on by appellants) would be utterly impractical and glaringly inequitable in the exigencies of the case developed by the facts. Therefore, the opinion properly searches for, and finally discovers and applies what is regarded therein as the proper shaping tool from the law's reserved chest, but which I think is the improper one. Authority for the grafting upon a universally established rule an exception to meet the exigencies of the case, or to reshape and remodel it so as to fit the facts in hand, is well stated in the text of 21 C. J. pages 22 to and including page 30, and the devotion of more time and space would thoroughly demonstrate it. Such authority springs from the recognized fact that the reservoir of the law, containing available equitable principles, is not supposed to ever become so depleted as to render courts impotent in the administration of justice. The theory herein advanced for the correct principle upon which the judgment should be based, recognizes and employs that authority, the same as does the majority opinion; but it is my conclusion that the theory herein advanced is the one best fitted and best calculated to guarantee and perpetually

preserve the rights of all parties concerned than is the one adopted and approved by the majority members. The sui generis nature of the case producing the demonstrated exigencies undoubtedly calls for an exercise of that authority in declaring the principles upon which the rights of all parties concerned should be adjusted.

My theory is this: That the cave in this sui generis case should be treated as a unit of property throughout its entire exhibitable length, including the augmentations of prongs or branches, and that it should be adjudged as owned jointly by all of the surface owners above it, in proportion that the length of their surface ownership bears to the entire length of such exhibitable portion. I realize that herein lies the departure (but which I think is justified from the exigencies of the case) from the ancient rule of, "Cujus est solum, ejus est usque ad coleum et ad infernos (to whomsoever the soil belongs, he owns also to the sky and to the depths.)" That maxim literally followed would segmentize ownership both above and below the surface corresponding to boundaries of the latter; and it is the denying of that effect, as applied to property of the nature of a cave, that constitutes the departure from, or exception to the rule, that I advocate; whilst the majority opinion not only discards that theory, but advocates other departures equally if not more drastic, and which are necessarily followed by much more impractical and destructive consequences. The same departure has already been made by all courts before which the question has arisen, with reference to ownership "to the sky" by the owner of the surface, in determining aerial navigation rights, and which departure was forced by the necessities of the case. I, therefore, can conceive of no objection to extending it in the opposite direction when the same necessities demand it.

Joint ownership arises under three classes of acquired titles. Under one, the several owners are known as "cotenants"; under another they are known as "tenants in common"; and still another they are known as "joint tenants" or "holders in coparcenary." But subsection 28 of section 732 of our Civil Code of Practice dispenses with the common-law distinctions and treats alike all of such joint ownerships. It was so interpreted and applied in the case of Melton v. Sellars, 167 Ky. 704, 181 S. W. 346. The Code provision, therefore, dis-

penses with the technical distinction of such joint ownerships and upholds all the rights that a cotenant would have at common law in and to the jointly owned property. Among those rights are (1) to employ the jointly owned property so as to produce profit to the one so employing it, as well as to his co-owner or owners, and (2) to call upon his cotenant or tenants, who do profitably employ the property, to account to him for his proportion of the net profits. See the text in 7 R. C. L. 832, sec. 26, and Freeman on Co-Tenancy, sec. 270 et seq.

The cave in divided segments according to surface ownership, if the division should be made, would render each segment of little profit producing value. But the theory of the opinion indisputably implies that right which if exercised would render all portions of the cave beyond the Edwards boundary (within which is located its entrance from the surface) absolutely valueless, since it is incontrovertibly established by the evidence in this case that no opening into the cave can be made upon any of the lands of the respective owners extending back from its mouth located, as said, within the Edwards boundary. Nevertheless, as pointed out, the other owners of different segments of the cave (back from its entrance) may prevent, under the theory adopted by the majority opinion, the owners of the Edwards tract from exhibiting any portion of the cave than that which lies under their surface. With the attractiveness of the cave thus curtailed, but a small amount of patronage of inspecting it could be obtained, since the sightseers could penetrate it no farther than the Edwards line. The same consequences would follow as to the other segments, if their owners could make a practical entrance into their separately owned segment, but which as we have seen, they cannot do. Thus the cave as an entirety, as will be easily seen, could be destroyed as a profit producing property, and also as a pleasing and educating exhibition to the members of the public. But such consequences could not and would not follow the theory herein advanced. Following its adoption, remedies are abundant whereby any joint owner might enforce the continued opening and operation of the cave, even by the appointment of a receiver if necessary, or the employment of some other remedy known to the law. The theory of joint ownership which I conclude is the correct one to adopt and apply under the exigencies of this case

434

does not conflict with the maxim supra that the surface owner also owns to the "depths below," except that it applies his ownership—not to the particular segment underlying his surface rights—but to the aliquot part of the entire attractive vacuum made by nature, called "a cave," and that the extent of his joint ownership in the entire property is measured by his surface rights. As will be seen, that theory prevents any such obstructive and destroying consequence as is above pointed out, both as applied to each joint owner and to the sightseeing public; as well as to render easy the adjustments of the rights of all the owners in all future operation of the cave as a profit-producing agency.

If it should be said that some of the rulings heretofore advanced by us in former appeals with reference to the rights of the parties in this case prevent the application of the views of joint ownership herein advocated, the answer is that so far as I have been able to discover such orders were interlocutory in their nature and were not final, being employed only to preserve the status until a correct and final determination of the rights of the parties could be adjudged. If, however, I should be mistaken in that, then the majority opinion might be approved as being the only equitable one now available, after barring the joint ownership theory in this particular case under the "law of the case" rule, but at the same time declare that as to future cases of like nature the joint ownership theory should prevail.

For the reasons stated, I concur in the result of the majority opinion, but disagree with the theory upon which it is based.