Samuel R. Lamb filed suit against Reckie R. Barela seeking possession of 68 cows, 2 angus bulls, the increase thereof, and damages for the conversion of these animals. Opelika Production Credit Association (Opelika Credit) intervened in the action claiming all of the cattle in Barela's care under a security agreement executed by Barela. The intervenor also claimed $74,582.28 due by open account from Lamb and Barela, jointly and severally, as well as money owed them by Barela separately on two promissory notes. All parties to the action agreed to sell all of the cattle in Barela's possession and to deposit the proceeds with the court for allocation between the parties following a final determination by the court.
The trial court, at the close of Opelika Credit's case, directed a verdict in favor of *Page 97 
Lamb and his wife. Barela failed to appear to defend the action, and the trial court gave the affirmative charge in favor of Opelika Credit and against Barela. The jury returned a verdict of $69,422.40 against Barela. The court ordered a division of the proceeds of the cattle sale, totaling $8,400, awarding two-thirds to Lamb. Opelika Credit's motion for new trial against Lamb was denied and it appealed. It urges that the trial court erred in directing a verdict on its claim against Lamb and in denying its motion for new trial. We affirm.
Lamb, a practicing physician from Jacksonville, Florida, and Barela, his son-in-law at the time, entered into a written contract for the operation of a cattle ranch on August 8, 1973, which provided:
"CONTRACT AGREEMENT
 "THIS AGREEMENT made the 8th day of August, 1973, by and between SAMUEL R. LAMB, M.D. and HELEN E. LAMB, hereinafter called `Lamb,' and RECKIE R. BARELA, hereinafter called `Barela.'
"The parties agree and contract as follows:
 "1. Lamb has purchased from Barela 68 brood cows and 2 Angus bulls together with winter feed and pasture leases for said animals through January 5, 1974, for the sum of $17,000.00.
 "2. Barela agrees to keep said animals together with other cows as may be placed in his care by Lamb, pastured and fed through January 5, 1974. After January 5, 1974, pasturing and feeding will be renegotiated by both parties together and will be paid for from calf crop sales as common herd expense or such other way as may be expedient, equitable and mutually agreed to by both parties in writing and to be added to this agreement as an addendum.
 "3. Barela further agrees to take care of all of said animals placed in his care by Lamb from the date of this agreement until their first full crop of calves come in. Barela's compensation for his services in tending said animals for the first year of this contract will be one-half of the first calf crop or the proceeds therefrom. Barela's compensation after the first year will be one-half of each year's ensuing calf crop or proceeds therefrom from the herd as it enlarges from year to year. Barela will not receive any other compensation from Lamb for his services.
 "4. In the event of the dissolving of this contract agreement all cows paid for by Lamb's personal monies and/or all cows paid for by Barela personal monies shall belong entirely to each party thereto with the remaining purchase of the herd or proceeds therefrom being divided equally.
 "5. It is further agreed that this contract shall be binding as stated above on both parties for three (3) years and that any and all proceeds are to be spent solely for maintenance, care and enlarging the herd brood cows as rapidly as possible. After the third year, this contract agreement will be renegotiated by both parties.
 "IN WITNESS WHEREOF the parties have signed this agreement the day and year above stated.
 /s/ Samuel R. Lamb
SAMUEL R. LAMB, M.D.
 /s/ Helen E. Lamb
HELEN E. LAMB
 /s/ Reckie R. Barela
RECKIE R. BARELA"
Lamb named the operation "Lambarela Ranch" and established a checking account in which he deposited $500 each month for its operation. Barela was authorized to write checks on this account.
In late 1973, Barela began the acquisition of a substantial number of additional cattle. Lamb testified that Barela informed him of the acquisition, stating that he was being sponsored by the Alabama Cattlemen's Association which loaned him money at 6% interest to purchase the cattle, to be repaid from the proceeds obtained through a sale of the calf crop. Lamb denied any further knowledge of the source of the purchase money for the cattle. He and Barela agreed orally that Lamb would depreciate *Page 98 
the newly acquired cattle, as well as the original herd purchased by Lamb, on his Income Tax Returns. In 1973, 1974 and 1975, Lamb took a total depreciation deduction on all of the cattle amounting to $34,347.25.
Barela had actually borrowed the purchase money for the cattle from Opelika Credit. In his deposition, which was admitted into evidence at the trial because of his absence, Barela said that Lamb was aware of his dealings with Opelika Credit and, in fact, instigated the loan negotiations in order to increase the cattle herd without increasing his original capital investment. Barela never informed Opelika Credit of his business relationship with Lamb, and executed each of the documents required by Opelika Credit in his personal name. Opelika Credit was unaware of the arrangement between Lamb and Barela.
Between September 17, 1973, and April 15, 1974, Barela borrowed $54,040 from Opelika Credit with which he purchased 187 head of cattle, three bulls, three horses, one pick-up truck, and 1300 shares of participating stock in Opelika Credit. To secure the loans, he executed a security agreement and several promissory notes. On December 2, 1974, he borrowed an additional $5,560 to recover cattle which had escaped from a pasture leased by Barela, and executed another note in that amount. In 1975, Barela executed a renewal note for $59,755 covering the original indebtedness, plus interest accrued, service charges, and agreed to purchase 114 additional shares in Opelika Credit. The jury's award of damages to Opelika Credit reflected the sum of these notes less the value of the shares which Opelika Credit retained.
Lamb had directed Barela not to sell any cattle or any part of the calf crop without his knowledge. Lamb demanded records of all transactions for tax purchases. Lamb filed suit in 1975 because Barela sold off a number of cattle without Lamb's permission. There is no evidence in the record that Lamb received any part of the proceeds of these sales. The only return received by Lamb or his investment was $3,000 from the sale of 10 head of cattle.
Opelika Credit maintains that Lamb is liable to it for the debts incurred by Barela under three alternative theories: (1) That Barela served as Lamb's agent; (2) that Lamb and Barela were partners and the debts incurred by Barela were partnership debts for which Lamb is jointly and severally liable; and (3) that even if Barela was not authorized to borrow money on Lamb's behalf, his actions were subsequently ratified by Lamb. Opelika Credit argues that it presented at least a scintilla of evidence to support each of these theories.
The debts incurred by Barela to Opelika Credit were evidenced by promissory notes and negotiable instruments. Therefore, to recover against Lamb, the payee must show that he received the underlying consideration, and that Barela was Lamb's agent, authorized to bind him contractually. The intervenor argues that there was evidence from which the jury could have found that Barela was acting as Lamb's agent in making the loan. However, even if the agency were proven, Lamb's liability is still limited because his status in the transaction would be that of an undisclosed principal. In such cases, the undisclosed principal is not liable on a negotiable instrument. Second Restatement, Agency, § 192. The party signing the instrument is liable thereunder. § 7-3-401, 1975 Code. This does not exempt the principal from liability for the debt. His liability may still arise under an equitable doctrine of quasi-contract. Under that doctrine, an undisclosed principal may not accept and retain the benefits of the agent's agreement with a third party, but will be held liable for those benefits in restitution. Britton v. Mitchell, 361 F.2d 922 (10th Cir. 1966); Lady v. Thomas, 38 Cal.App.2d 688, 102 P.2d 396 (1940);Johnson v. Maddock, 119 Fla. 777, 161 So. 842 (1935). Any recovery by Opelika Credit on either of the three theories advanced must arise under this equitable remedy and is limited to the benefit received by Lamb. See Restatement, Restitution, § 111 (2), Comment (1937); Dobbs, Remedies, § 12.1, p. 791 (1973). *Page 99 
The theoretical underpinnings of a quasi-contractual recovery were first articulated by Lord Mansfield in Moses v. Macferlan, 2 Burr. 1005, 97 Eng.Rep. 676, 678, 680 (K.B. 1760):
 ". . . If the defendant be under an obligation, from the ties of natural justice, to refund; the law implies a debt, and gives this action, founded in the equity of the plaintiff's case, as it were upon a contract ('quasi ex contractu,' as the Roman law expresses it).
". . .
 "This kind of equitable action, to recover back money, which ought not in justice to be kept, is very beneficial, and therefore much encouraged. It lies only for money which, ex aequo et bono, the defendant ought to refund. . . ."
Under modern authorities, the remedy has been expanded to reach benefits other than money received. A person may be considered to have conferred a benefit upon another if he has given him possession of, or an interest in, land, chattels, or choses in action, or if he performs some service which is beneficial to or at the request of the other person, or if he satisfies a duty on a debt of the other. Whenever one person adds to the other's advantage in any form, whether by increasing his holdings or saving him from expense or loss, he has conferred a benefit upon the other. Restatement, Restitution, § 1 (b); Sullivan, The Concept of Benefit in theLaw of Quasi-Contract, 64 Geo.L.J. 1 (1975).
The remedy of quasi-contract is founded upon the familiar principle of avoiding unjust enrichment. Where the plaintiff has suffered a detriment, and the defendant has received a benefit as a result, it is said that justice demands the repayment by the defendant of the plaintiff's loss. The measure of the defendant's liability is, however, limited to the value of the benefit received, whether or not it is equal to, less than, or greater than the plaintiff's loss. But, in any case, there must be a detriment, and a resulting benefit, and the two must be related. See, Edwards v. Lee's Administrator, 265 Ky. 418, 96 S.W.2d 1028 (1936); Olwell v. NYE Nissen Co.,26 Wn.2d 282, 173 P.2d 652 (1946); Comment, The Necessity ofConferring a Benefit for Recovery in Quasi-Contract, 19 Hast. L.J. 1259 (1968).
In the instant case, the evidence does not show that Lamb has obtained any benefit from the transactions between Barela and Opelika Credit. Lamb received no money, no profit from the sale of any of the cattle, and is in no better position as a result of the loan by Opelika Credit. The only evidence offered by Opelika Credit was to the effect that Lamb depreciated the cattle. This is not a benefit derived from Barela's indebtedness as such; and, although it could not have arisen without the purchase of the cattle, it was not a direct benefit derived from the loan. The link between Barela's transactions with Opelika Credit and Lamb's depreciation of the cattle is too tenuous to support the remedy of restitution in quasi-contract. Lamb has nothing which belongs to Opelika Credit or which strengthened his position and weakened the position of Opelika Credit. The benefit must be realized as a direct result of the transaction. The majority of cases involving the liability of an undisclosed principal under similar circumstances present facts showing that the principal himself received the consideration for which the negotiable instrument was given by the agent, or money which was used to pay a debt of the undisclosed principal. See, Lady v. Thomas, supra; Schwaegler Co. v. Marchesotti, 88 Cal.App.2d 738,199 P.2d 331 (1948); Johnson v. Maddock, supra; Plains State Bankv. Ellis, 174 Kan. 653, 258 P.2d 313 (1953). Such is not the case here. The only money ever received by Lamb was the $3,000 received as the proceeds for the sale of 10 head of cattle, but it was not shown that these cattle were ever removed from the ranch or that they were among the cattle purchased with Opelika Credit's money.
Absent a showing of a direct benefit by Lamb which resulted from Opelika Credit's loans to Barela, it has presented no *Page 100 
evidence to support its claim against Lamb, even when the testimony is viewed most favorably toward Opelika Credit. In such cases, a directed verdict is proper. Beloit Corp. v.Harrell, 339 So.2d 992 (Ala. 1976); Riley v. Banks, 289 Ala. 56, 265 So.2d 599 (1972).
For these reasons, the judgment of the trial court is affirmed.
AFFIRMED.
TORBERT, C.J., and MADDOX, JONES and BEATTY, JJ., concur.