(Slip Opinion) OCTOBER TERM, 2025 1

Syllabus

NOTE: Where it is feasible, a syllabus (headnote) will be released, as is being done in connection with this case, at the time the opinion is issued. The syllabus constitutes no part of the opinion of the Court but has been prepared by the Reporter of Decisions for the convenience of the reader. See *United States* v. *Detroit Timber & Lumber Co.,* 200 U. S. 321, 337.

# SUPREME COURT OF THE UNITED STATES

Syllabus

## SRIPETCH *v.* SECURITIES AND EXCHANGE COMMISSION

CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

No. 25–466.   Argued April 20, 2026—Decided June 4, 2026

Ongkaruck Sripetch engaged in numerous fraudulent schemes involving at least 20 penny-stock companies.  On discovering the schemes, the Securities and Exchange Commission (SEC) brought a civil enforcement action against Mr. Sripetch, charging him with six counts of securities fraud and one count of selling unregistered securities.  Mr. Sripetch consented to the entry of judgment against him and agreed that the court could order disgorgement.  When the SEC proceeded to seek over $4.1 million in disgorgement, however, Mr. Sripetch objected.  He argued that the SEC's request violated *Liu* v. *SEC*, 591 U. S. 71, because the SEC lacked evidence that his schemes caused investors to suffer any financial losses.  On appeal, the Ninth Circuit rejected Mr. Sripetch's argument, deepening a split among the Courts of Appeals.

*Held*: A showing of pecuniary loss to investors is not required before the SEC may obtain a disgorgement award.  Pp. 6–13.

   (a) The Court's analysis begins with two statutory provisions, 15 U. S. C. §§78u(d)(5) and 78u(d)(7).  Section 78u(d)(5) allows the SEC to obtain "any equitable relief that may be appropriate or necessary for the benefit of investors."  *Liu* held this provision permits a court to order disgorgement so long as the remedy adheres to traditional equitable principles.  591 U. S., at 85.  After *Liu*, Congress adopted §78u(d)(7), which expressly allows the SEC to seek disgorgement in enforcement proceedings.  The Court need not decide whether or how §78u(d)(7) affects the scope of the SEC's disgorgement powers.  Even assuming that disgorgement under §78u(d)(7) remains an equitable

remedy that must comply with traditional equitable rules, a showing of pecuniary loss to investors is not required before the SEC may obtain disgorgement. Pp. 6–8.

(b) Courts sitting in equity have long issued remedies designed to "depriv[e] wrongdoers of their net profits from unlawful activity." *Liu*, 591 U. S., at 79. Under traditional equitable principles, a person seeking that kind of remedy does not need to prove he has "suffered a corresponding loss or," indeed, "any loss." Restatement (First) of Restitution §1, Comment *e*. Rather, when a person "has suffered an interference with protected interests," he may be entitled to "restitution of [the defendant's] wrongful gain" from that interference even when he has suffered "no measurable loss whatsoever." Restatement (Third) of Restitution and Unjust Enrichment, §3, Reporter's Note *a*. The point of the remedy is for "the defendant . . . to give to the plaintiff the amount by which he has been enriched" from the wrongful invasion of the plaintiff's legally protected interests, not to compensate the plaintiff for a financial loss. Restatement (First) of Restitution §1, Comment *e*. Numerous cases illustrate this principle. See, *e.g., Raven Red Ash Coal Co.* v. *Ball*, 185 Va. 534, 39 S. E. 2d 231; *Edwards* v. *Lee's Adm'r*, 265 Ky. 418, 96 S. W. 2d 1028. Pp. 8–11.

(c) The Court rejects Mr. Sripetch's arguments to the contrary. He contends that *Liu* announced a rule requiring the SEC to make a showing of pecuniary loss before securing disgorgement. It did not. While *Liu* held that disgorgement must be "awarded for victims," 591 U. S., at 79, it drew this requirement from traditional equitable principles, and those principles do not demand a showing of pecuniary loss before a person may qualify as a "victim" entitled to an award of a wrongdoer's profits.

Mr. Sripetch submits that failing to require pecuniary loss would be inconsistent with *Liu*'s description of disgorgement as a remedy designed to "restor[e] the status quo." *Id.,* at 80. That is incorrect. In some instances, a defendant can unjustly enrich himself even without leaving a plaintiff worse off financially, and in those instances, a court must choose between two status quos: It can either restore the defendant to his prior position by stripping him of his unjust gains, or it can allow the defendant to benefit from his misconduct because the plaintiff's financial position has not changed. Equity traditionally prefers the first outcome, not the second.

Mr. Sripetch expresses concern that, without a pecuniary loss requirement, the SEC might lose sight of traditional equitable principles and use §78u(d)(7) to seek penalties for the Treasury rather than compensation for victims. Should the SEC do so, that development would raise questions about whether and to what degree §78u(d)(7) permits deviation from equitable principles. But that does not mean this Court

Syllabus

should hold that the SEC's disgorgement remedy requires proof of pecuniary loss—a requirement foreign to *Liu* and to traditional equitable principles alike.

　　*Amici*'s concern that the SEC might seek disgorgement even for securities-law violations that do not invade the legally protected interests of investors is beside the point in this case, as Mr. Sripetch has not disputed that his victims suffered a violation of their legally protected interests.  Pp. 11–13.

154 F. 4th 980, affirmed.

　　GORSUCH, J., delivered the opinion for a unanimous Court.  THOMAS, J., filed a concurring opinion.

NOTICE: This opinion is subject to formal revision before publication in the
United States Reports. Readers are requested to notify the Reporter of
Decisions, Supreme Court of the United States, Washington, D. C. 20543,
pio@supremecourt.gov, of any typographical or other formal errors.

# SUPREME COURT OF THE UNITED STATES

No. 25–466

ONGKARUCK SRIPETCH, PETITIONER *v.*
SECURITIES AND EXCHANGE
COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF
APPEALS FOR THE NINTH CIRCUIT

[June 4, 2026]

JUSTICE GORSUCH delivered the opinion of the Court.

The Securities and Exchange Commission (SEC) may sometimes seek a court order directing those who violate federal securities laws to disgorge their ill-gotten gains to wronged investors. This case presents the question whether, as a condition of securing that relief, the SEC must prove victims of the securities-law violation have suffered pecuniary loss.

I

A

The SEC's disgorgement powers have a long and nuanced history. When Congress created the SEC in the 1930s, it did not authorize the Commission to seek monetary awards for violations of federal securities laws. Instead, "the only statutory remedy" the SEC could pursue was a judicial "injunction barring future violations of securities laws." *Kokesh* v. *SEC*, 581 U. S. 455, 458 (2017). With time, that changed. In 1990, for example, Congress provided the Commission with "a full panoply" of additional enforcement tools, including the power to "seek monetary penalties" for

certain violations.  *Id.*, at 459.  But even then, nothing in statutory law expressly authorized the SEC to seek and receive a judicial order directing a defendant to disgorge his ill-gotten gains to wronged investors.  See *id.*, at 458–459.

Instead, that remedy emerged like this.  Beginning in the 1970s, the SEC persuaded lower courts to order those who had violated federal securities laws to disgorge their unlawfully earned gains "as an exercise of th[e] [courts'] 'inherent equity power to grant relief ancillary to an injunction.'"  *Id.*, at 458 (quoting *SEC* v. *Texas Gulf Sulphur Co.,* 312 F. Supp. 77, 91 (SDNY 1970)).  At first, some courts seemed to conceive of this remedy as a type of "restitution" to victims.  *SEC* v. *Texas Gulf Sulphur Co.*, 446 F. 2d 1301, 1307–1308 (CA2 1971).  But eventually, the SEC began routinely seeking and obtaining disgorgement awards that went "beyond compensati[ng]" victims by sending disgorged funds "to the United States Treasury."  *Kokesh*, 581 U. S., at 465, 467 (internal quotation marks omitted).  Not only that, the sums disgorged often "exceed[ed] the profits" the defendant had "gained as a result of [his] violation."  *Id.*, at 466.

This Court first addressed these developments in 2017 in *Kokesh*.  There, the SEC argued that no statute of limitations applied to its actions seeking disgorgement.  We disagreed, observing instead that 28 U. S. C. §2462 imposes a 5-year limitations period for "'any civil fine, penalty, or forfeiture.'"  581 U. S., at 457 (quoting §2462).  Given what disgorgement had become, we held, the remedy amounted to a civil penalty subject to §2462's limitations period.  *Id.*, at 461–467.  In reaching that holding, though, we expressed no "opinion on whether courts possess authority to order disgorgement in SEC enforcement proceedings" to begin with, nor did we express any "opinion . . . on whether courts have properly applied disgorgement principles in this context."  *Id.*, at 461, n. 3.

We agreed to answer those questions three years later in *Liu* v. *SEC,* 591 U. S. 71 (2020).  While the term

"disgorgement" still appeared nowhere on the list of its statutory remedies, the SEC stressed that Congress had enacted 15 U. S. C. §78u(d)(5) in 2002, a provision allowing it to seek "any equitable relief that may be appropriate or necessary for the benefit of investors." And, the Commission argued, that statute's reference to "equitable relief" was broad enough to authorize its existing practice of seeking disgorgement awards. See *Liu*, 591 U. S., at 76–77.

We agreed in part. Yes, we held, "equitable relief" can encompass a disgorgement remedy. See *id.*, at 85–87. But no, we added, the term "equitable relief" does not capture the kind of disgorgement the SEC had often sought in lower courts. See *id.*, at 85–92. And though we did not purport to set forth all "the bounds of traditional equity practice" applicable under §78u(d)(5), *id.*, at 87, we did identify some key limitations on the disgorgement remedy authorized by that statute's "equitable relief" language.

Among those limitations were these two. First, because equity seeks to "depriv[e] wrongdoers of their . . . profits from unlawful activity," we held that any remedy must be limited to the defendant's net profits (not total revenues) derived from his securities-law violations. *Id.*, at 79; see also *id.*, at 85, 91–92. Second, because equity aims to deliver "wrongful gains" to "wronged victims"—a point reinforced by §78u(d)(5)'s focus on "investors"—we concluded that any amounts the SEC secures must be "awarded for victims." *Id.*, at 79, 82–85, 89–90. Accordingly, we held that the SEC must "return a defendant's gains to wronged investors," contrary to its "practice of depositing a defendant's gains with the Treasury." *Id.*, at 88.

As much as it resolved, *Liu* left some questions unanswered. We did not decide whether the SEC may seek disgorgement when it is "infeasible to distribute the collected funds to investors." *Id.*, at 89. Nor did we decide what showing the Commission might have to make to prove "[in]feasibility." *Ibid.*, n. 5. (Those questions remain for

another day yet, as they have no bearing on this case.) *Liu* also left unaddressed what statute of limitations might apply to disgorgement actions under §78u(d)(5). True, *Kokesh* had held that §2462's 5-year limitations period governed actions seeking disgorgement because, at that time, the remedy amounted to a civil penalty. See 581 U. S., at 467. But going forward, *Liu* clarified, disgorgement would need to follow "traditional equitable principles," which do not confer the power to impose a "penalty." 591 U. S., at 85, 90; see also *Marshall* v. *Vicksburg,* 15 Wall. 146, 149 (1873) ("Equity never . . . lends its aid to enforce a . . . penalty"). So the question of what limitations period, if any, might attach to SEC disgorgement actions once again became uncertain.

Six months after *Liu*, Congress again addressed the SEC's remedial powers. In doing so, it left intact the Commission's authority to seek "equitable relief" in §78u(d)(5). But, in §78u(d)(7), Congress now explicitly added "disgorgement" to the SEC's list of enforcement tools. And it provided that the SEC may seek "disgorgement under paragraph (7) of any unjust enrichment by the person who received such unjust enrichment as a result of" his securities-law violation. §78u(d)(3)(A)(ii). Finally, Congress added two new statutes of limitations—one governing equitable relief generally and another expressly addressing disgorgement. See §78u(d)(8).

B

All that brings us to this case. Ongkaruck Sripetch "'engage[d] in numerous fraudulent schemes . . . involving at least 20 penny stock companies.'" 154 F. 4th 980, 984 (CA9 2025). Some were classic "pump and dump" operations in which Mr. Sripetch and his co-conspirators obtained shares of penny-stock companies, promoted the companies to others, watched the share price rise, and then promptly sold. App. to Pet. for Cert. 25a–26a (Pet. App.). On discovering the schemes, the SEC brought a civil enforcement action

against Mr. Sripetch, charging him in court with six counts of securities fraud and one count of selling unregistered securities. Mr. Sripetch consented to the entry of judgment against him and agreed that the court could order disgorgement.

When the SEC proceeded to seek over $4.1 million in disgorgement, however, Mr. Sripetch objected. As relevant here, he argued that the SEC's request violated *Liu* for a very specific reason: The Commission lacked evidence that his schemes caused investors to suffer any "financial losses," so there were no "victims" for whom disgorgement could be awarded under *Liu*. No. 3:20–cv–01864 (SD Cal.), ECF Doc. 142–1, pp. 9–10. The SEC disagreed, arguing that investors could qualify as "victims" under *Liu* even if they lost no money. No. 3:20–cv–01864 (SD Cal.), ECF Doc. 145, pp. 2–5. And the Commission asserted that, regardless, its evidence demonstrated that investors had suffered pecuniary loss "as a result of Sripetch's wrongdoing." *Id.*, at 5–6.

The district court accepted the Commission's second argument. As it saw things, the SEC had done enough to show that Mr. Sripetch's investors had suffered pecuniary loss. Pet. App. 30a. Accordingly, the district court did not decide whether such a showing was required in the first place. *Ibid.*

When Mr. Sripetch appealed, however, the Ninth Circuit proceeded differently. Accepting the SEC's threshold argument, it held that "a finding of pecuniary harm is not required" before a court orders disgorgement. 154 F. 4th, at 985. The Ninth Circuit acknowledged that, under *Liu*, disgorgement "must be 'awarded for victims.'" 154 F. 4th, at 986 (quoting 591 U. S., at 75). But it rejected Mr. Sripetch's submission that "'victim'" must be "narrowly defined as an individual or entity that has suffered pecuniary harm." 154 F. 4th, at 986. As support, the court pointed to common law sources indicating that "a claimant seeking disgorgement

need only show 'an actionable interference by the defendant with the claimant's legally protected interests.'" *Ibid.* (quoting Restatement (Third) of Restitution and Unjust Enrichment §51(1) (2010) (Third Restatement)). Given its conclusion that the SEC did not need to show pecuniary loss at all, the court declined to decide whether the SEC had in fact "made a showing of pecuniary harm." 154 F. 4th, at 985, n. 4.

The Ninth Circuit's decision deepened a split among the Courts of Appeals. See *id.*, at 985. While the First and Ninth Circuits have held that the SEC may obtain disgorgement without proving investors have suffered pecuniary loss, the Second Circuit has taken the opposite view. Compare *SEC* v. *Navellier & Assoc.*, 108 F. 4th 19, 41, and n. 14 (CA1 2024), and 154 F. 4th, at 985, with *SEC* v. *Govil*, 86 F. 4th 89, 106 (CA2 2023). We granted certiorari to resolve that disagreement. 607 U. S. 1120 (2026).

## II

We begin with two statutory provisions, §§78u(d)(5) and 78u(d)(7). Enacted in 2002, §78u(d)(5) allows the SEC to obtain "any equitable relief that may be appropriate or necessary for the benefit of investors." *Liu* held this provision permits a court to order disgorgement so long as the remedy adheres to traditional equitable principles. 591 U. S., at 85. After *Liu*, Congress adopted §78u(d)(7), which expressly allows the Commission to seek disgorgement in enforcement proceedings.

Before us, the parties spill much ink debating how the addition of §78u(d)(7) affects the scope of the SEC's disgorgement powers. Mr. Sripetch contends that the same equitable constraints *Liu* held applicable to disgorgement under §78u(d)(5) also apply under §78u(d)(7). See Brief for Petitioner 20–21. That is so, he says, because Congress meant simply to codify *Liu* when it adopted §78u(d)(7) and expressly authorized a disgorgement remedy for the first

time.  Beyond that, Mr. Sripetch argues, the primary function of Congress's work was to resolve what limitations period should apply to the SEC's disgorgement remedy after the unsettling effect *Liu* had on that question.  See §78u(d)(8).

The Commission sees things differently.  It concedes that under §78u(d)(7), as under §78u(d)(5), the SEC may seek disgorgement of only (1) a defendant's net profits that were (2) causally connected to his unlawful conduct.  See Brief for Respondent 33–35; *Liu*, 591 U. S., at 83–84, 90–92; Third Restatement §51, Comment *f*.  After all, Congress's new statutory language authorizing disgorgement permits the Commission to seek no more than the "unjust enrichment" a defendant "received . . . as a result of" his securities-law violations.  §78u(d)(3)(A)(ii).  At the same time, the SEC claims that §78u(d)(7) differs from §78u(d)(5) in one important respect.  While we held in *Liu* that disgorgement under §78u(d)(5) must be "awarded for victims" of the defendant's securities-law violations, 591 U. S., at 79, the SEC argues this constraint does not apply when it seeks disgorgement under the new provision Congress added after *Liu*.  As a result, the Commission says, in actions under §78u(d)(7), it does not have to connect the unlawful profits it seeks to any specific victims and the government may resume its former practice of keeping disgorgement awards for itself.  Brief for Respondent 35.

To decide this case, we need not resolve that dispute.  The question we face is not whether Congress's recent amendments free the SEC from the traditional equitable rule that disgorgement must be "awarded for victims."  *Liu*, 591 U. S., at 79.  The only question we took this case to resolve is whether the SEC must show that an investor suffered a pecuniary loss before it may secure a disgorgement remedy under either §78u(d)(5) or §78u(d)(7).  And to answer that question, we can simply assume without deciding that disgorgement under §78u(d)(7) remains an equitable

remedy—so that it must comply with traditional equitable rules, including the rule that disgorgement must be awarded for victims. Even assuming all that to be true, we conclude that a showing of pecuniary loss is not required before an investor may qualify as a victim of an offender's wrongdoing entitled to compensation.

## A

Perhaps the easiest way to see why traditional equitable principles associated with disgorgement do not require proof of pecuniary loss is to contrast that remedy with the legal remedy of damages. Ordinarily, when a person violates the legal rights of another, a court will order the wrongdoer to pay damages measured by the "plaintiff's loss." D. Dobbs & C. Roberts, Law of Remedies: Damages–Equity–Restitution §3.1, p. 213 (3d ed. 2018) (Dobbs). The primary goal is "to put the plaintiff in as good a position as he would have been in" absent the wrongdoer's actions. 3 S. Williston, Law of Contracts §1338, p. 2392 (1920); see also Dobbs §3.1, at 215 ("[D]amages is an instrument of corrective justice, an effort to put [the] plaintiff in his or her rightful position").

Historically, equity has provided a different option in certain circumstances. After a showing that the defendant interfered with the plaintiff's legally protected rights, courts sitting in equity have long issued remedies designed to "depriv[e] wrongdoers of their net profits from unlawful activity." *Liu*, 591 U. S., at 79. These remedies have taken varying forms and gone under different names, "restitution" and "disgorgement" among them. *Ibid.* All come with important limitations. For our purposes in this case, though, only one common feature matters: Generally, the final award to the plaintiff is not measured by his loss but by the defendant's gain attributable to his wrongdoing against the plaintiff. See Dobbs §3.1, at 213; Third Restatement §51, Comments *f, h, i.*

The answer to this case follows from that distinction. Under traditional equitable principles, a victim seeking disgorgement of a defendant's unlawful gains does not need to prove he has "suffered a corresponding loss or," indeed, "any loss." Restatement (First) of Restitution §1, Comment *e* (1936) (First Restatement). Instead, when a victim "has suffered an interference with protected interests," he may be entitled to "restitution of [the defendant's] wrongful gain" from that interference even when he has suffered "no measurable loss whatsoever." Third Restatement §3, Reporter's Note *a*; *id*., §1, Comment *a*. The point of the remedy is for "the defendant . . . to give to the plaintiff the amount by which he has been enriched" from the wrongful invasion of the plaintiff's legally protected interests, not to compensate the plaintiff for a financial loss. First Restatement §1, Comment *e*.

By way of illustration, consider *Raven Red Ash Coal Co.* v. *Ball*, 185 Va. 534, 39 S. E. 2d 231 (1946). There, a company had acquired the right to mine coal from a tract of land, part of which was owned by the plaintiff. *Id*., at 537–539, 39 S. E. 2d, at 232–233. Along with that right, the company also received an easement to cross the land, but only "'for the purpose of digging for, mining, or otherwise securing the coal'" from the tract in question. *Ibid*. The company did just that, constructing a railroad across the land and using it to transport coal. *Ibid*. But, without authorization, the company also used the railroad to transport coal from *other* tracts of land. *Ibid*. The plaintiff sued, alleging that the company had exceeded the scope of its easement. *Ibid*. A jury agreed, awarding the plaintiff $500 even though he admitted that he had suffered "'no more damage'" than being occasionally excluded from the land when the additional coal carts happened to pass through. *Ibid*. And an appellate court affirmed the award because it represented "a fair value of the benefits" the company unjustly received from its trespass. *Id*., at 548, 39 S. E. 2d, at 238–

239.  In other words, the plaintiff whose legally protected
interest had been invaded was entitled to the defendant's
gain from that wrongful conduct even without showing pe-
cuniary loss.

Many other cases are of a piece.  In *Corey* v. *Struve*, 170
Cal. 170, 149 P. 48 (1915), the plaintiff leased land to the
defendants and granted them a limited right to "plo[w] . . .
under" the tops of beets growing there for use "as a ferti-
lizer."  *Id.*, at 171, 149 P., at 48.  Instead, the defendants
sold the beet tops to be "eaten by . . . cattle."  *Ibid.*, 149 P.,
at 49.  The parties agreed that the plaintiff suffered no pe-
cuniary loss because of this deviation from their deal.  *Ibid.*
Even so, the court ordered the defendants to turn over to
the plaintiff "the proceeds of the sale of his property wrong-
fully made."  *Id.*, at 174, 149 P., at 50.  In *Edwards* v. *Lee's
Adm'r*, 265 Ky. 418, 96 S. W. 2d 1028 (1936), a man opened
a cave as a tourist attraction.  But about a third of the cave
sat under land belonging to his neighbor.  *Id.*, at 420–421,
96 S. W. 2d, at 1028–1029.  The court ordered the exhibitor
to hand over a third of his profits to his neighbor.  And it
did so despite the fact the cave was inaccessible from the
neighbor's property and he suffered no loss from its use as
a tourist attraction.  *Id.*, at 422–429, 96 S. W. 2d, at 1030–
1033.  In *Olwell* v. *Nye & Nissen Co.*, 26 Wash. 2d 282, 173
P. 2d 652 (1946), a court ordered the defendant to pay its
profits from its unauthorized use of an automatic egg-wash-
ing machine belonging to the plaintiff—even though the
plaintiff had no use for it at the time.  *Id.*, at 284–286, 173
P. 2d, at 653–654.  A number of our own decisions, too, pro-
ceeded similarly.  See, *e.g.*, *Leman* v. *Krentler-Arnold Hinge
Last Co.*, 284 U. S. 448, 455–457 (1932); *United States* v.
*Carter*, 217 U. S. 286, 305–306 (1910).

What all these and a great many other cases have in com-
mon is this:  Applying traditional equitable principles, a
court ordered the defendant to disgorge the value of the
gain attributable to his invasion of the plaintiff's legally

protected interests without requiring a showing of pecuniary loss. And to know that much is enough to know the answer to this case. Whatever else traditional equitable principles demand, they do not require a showing of pecuniary loss before a court may issue an award of unjust profits.

B

Resisting this conclusion, Mr. Sripetch offers a variety of arguments, the most salient of which bear mention. For starters, he contends that *Liu* precludes the outcome we reach. As he reads it, that decision already announced a rule requiring the SEC to make a showing of pecuniary loss before securing disgorgement. Brief for Petitioner 15–17. We disagree. To be sure, and as Mr. Sripetch stresses, *Liu* held that disgorgement must be "awarded for victims." 591 U. S., at 79. But as we have seen, *Liu* drew this requirement from traditional equitable principles, and those principles do not demand a showing of pecuniary loss before a person may qualify as a "victim" entitled to an award of a wrongdoer's profits.

Relatedly, Mr. Sripetch submits that allowing a court to award his victims monetary relief even when they have not suffered any pecuniary loss would be inconsistent with *Liu*'s description of disgorgement as a remedy designed to "'restor[e] the status quo.'" *Id.*, at 80 (quoting *Tull* v. *United States*, 481 U. S. 412, 424 (1987)). Again, we disagree. Perhaps in a perfect world every remedy would "restore the status quo" by putting both a wrongdoer and his victim in the same position they would have occupied absent the wrongful conduct. But in some instances, a defendant can unjustly enrich himself even without leaving a plaintiff worse off financially. And in those instances, a court must choose between two status quos: It can either restore the defendant to his prior position by stripping him of his unjust gains, or it can allow the defendant to benefit

from his misconduct because the plaintiff's financial posi-
tion has not changed. And as the cases above illustrate,
equity traditionally prefers the first outcome, not the sec-
ond. See also *Falk* v. *Hoffman*, 233 N. Y. 199, 202, 135 N.
E. 243, 244 (1922) (Cardozo, J.) ("Equity will not be overnice
in balancing the efficacy of one remedy against the efficacy
of another when action will baffle, and inaction may con-
firm, the purpose of the wrongdoer").

   At bottom, Mr. Sripetch's real worry seems to be that,
without a pecuniary loss requirement, the SEC might lose
sight of traditional equitable principles altogether. It
might, he says, try to use Congress's newly added provision
in §78u(d)(7) as a tool to resume its efforts to seek penalties
for the Treasury rather than compensation for victims.
Brief for Petitioner 22–23. Such a result, Mr. Sripetch re-
minds us, would hardly be consistent with traditional equi-
table principles, which never "len[d] [their] aid" to a "pen-
alty." *Marshall,* 15 Wall., at 149; see also *Liu*, 591 U. S., at
82, 90. And, he hints, we should be on high alert for this
problem given that, in this very case, the district court did
not require the SEC to explain how it planned to distribute
its disgorgement award to wronged investors. See Pet. App.
31a; ECF Doc. 142–1, pp. 9–10.

   This argument may proceed from a sound premise but
falters in its conclusion. Should the government seek to de-
part from traditional equitable principles and attempt to
use §78u(d)(7) to secure penalties, it would of course pro-
ceed beyond what *Liu* held §78u(d)(5) tolerates. 591 U. S.,
at 82–85. That development would raise questions about
whether and to what degree §78u(d)(7) permits deviation
from equitable principles, and it would invite other ques-
tions too. See, *e.g.*, *SEC* v. *Jarkesy*, 603 U. S. 109, 123–125
(2024) (holding that, when the SEC seeks penalties, the
Seventh Amendment entitles the defendant to a jury trial).
But none of this means, as Mr. Sripetch suggests, that we
should hold the SEC's disgorgement remedy requires proof

of pecuniary loss, a requirement foreign to *Liu* and to traditional equitable principles alike.

Mr. Sripetch's *amici* offer one more way still in which, they say, a decision for the SEC in this case could risk transforming disgorgement into a penalty. They point to the traditional equitable principle that disgorgement is appropriate only in cases where a defendant has violated a victim's legally protected rights. See, *e.g.*, Brief for Chamber of Commerce of the United States of America as *Amicus Curiae* 11–12 (citing Third Restatement §51, Comment *a*). And they express concern that the Commission might try to seek disgorgement even for securities-law violations that do not invade the legally protected interests of any investor. See *id.*, at 15–20. But that worry, too, is beside the point in this case for, as it comes to us, Mr. Sripetch has not disputed that his victims "suffer[ed] a violation of their legally protected interests." 154 F. 4th, at 986, n. 6.

*

Because traditional equitable principles do not require a showing of pecuniary loss to justify a disgorgement award and nothing in *Liu* teaches otherwise, the judgment of the Ninth Circuit is affirmed.

*It is so ordered.*

# SUPREME COURT OF THE UNITED STATES

_____

No. 25–466

_____

## ONGKARUCK SRIPETCH, PETITIONER *v.* SECURITIES AND EXCHANGE COMMISSION

ON WRIT OF CERTIORARI TO THE UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

[June 4, 2026]

JUSTICE THOMAS, concurring.

The Court correctly holds that the Securities and Exchange Commission can seek disgorgement as a remedy for securities fraud without showing that the victims suffered pecuniary harm. The Court assumes without deciding that disgorgement is an equitable remedy, even after Congress amended the statute to separate disgorgement from equitable remedies. In a future case, we should recognize that disgorgement is now a legal remedy for which the Seventh Amendment requires a jury trial.

## I

Disgorgement generally means the "act of giving up something (such as profits illegally obtained) on demand or by legal compulsion." Black's Law Dictionary 588 (12th ed. 2024). But, disgorgement has "never been a precise legal term," *SEC* v. *Hallam*, 42 F. 4th 316, 327 (CA5 2022), in part because it "has no basis in historical practice," *Liu* v. *SEC*, 591 U. S. 71, 95 (2020) (THOMAS, J., dissenting). This lack of pedigree causes confusion as to whether "disgorgement" refers to an "equitable" remedy or a "legal" one requiring a jury trial. See S. Bray, Fiduciary Remedies, in The Oxford Handbook of Fiduciary Law 454 (2019) (Bray, Fiduciary Remedies) (noting that "[s]ometimes"

disgorgement refers to "any gain-based equitable remedy," but "other times" the term is used to refer to "legal relief").

Lower courts created the disgorgement remedy for securities-law violations in the 1970s. See *ante,* at 1–2. In 1971, the Second Circuit became the first to hold that the SEC could pursue a "restitution of profits" remedy based on a violation of the securities laws. *SEC* v. *Texas Gulf Sulphur Co.*, 446 F. 2d 1301, 1307. The Second Circuit soon began to call this remedy "disgorgement." *SEC* v. *Manor Nursing Centers, Inc.*, 458 F. 2d 1082, 1105 (1972). It recognized that no statute "specifically authorize[d]" this new remedy, yet it believed that courts had equitable authority to create new remedies to deter securities-law violations. *Id.*, at 1103–1104; but see *Alexander* v. *Sandoval*, 532 U. S. 275, 286 (2001). Disgorgement "then leaked from that laboratory and spread rapidly to each regional circuit." *Hallam*, 42 F. 4th, at 327. In 2002, Congress amended the Exchange Act and authorized the SEC to pursue "any equitable relief that may be appropriate or necessary for the benefit of investors." §305, 116 Stat. 779. The SEC began invoking this new provision, 15 U. S. C. §78u(d)(5), as a statutory basis for the disgorgement remedy that it had already pursued for decades.

This Court eventually accepted disgorgement as an equitable remedy under §78u(d)(5) in 2020. In *Liu* v. *SEC*, this Court held that, despite disgorgement's "relatively recent vintage" and "'"protean character,"'" it was a traditional equitable remedy authorized by §78u(d)(5)'s general provision for equitable relief. 591 U. S., at 76, n. 1, 80; see also *id.*, at 94 (THOMAS, J., dissenting). The Court also emphasized that disgorgement would need to comply with traditional equitable rules, such as the duty to return disgorged funds to victims, at least when doing so was "feasible." See *id.*, at 87–90 (majority opinion); see also *ante,* at 2–4.

But, less than a year later, Congress amended the Exchange Act. §6501, 134 Stat. 4625. Congress added a new subsection—§78u(d)(7)—authorizing the SEC to seek "disgorgement." *Id.*, at 4626. A separate subsection conferred on federal district courts the power to "require disgorgement . . . of any unjust enrichment." §78u(d)(3)(A)(ii). And, Congress set different limitations periods for "disgorgement" and "equitable remedies." §§78u(d)(8)(A), (B). "Disgorgement" is subject to either a 5- or 10-year limitations period depending on the underlying violation, §78u(d)(8)(A), while "any equitable remedy" must be sought within 10 years, §78u(d)(8)(B).

## II

The Seventh Amendment requires a jury trial when the SEC seeks disgorgement because Congress has now made disgorgement a legal remedy, not an equitable one.

## A

The Seventh Amendment provides that "the right of trial by jury shall be preserved" in "Suits at common law." "By *common law*," the Constitution means "suits in which *legal* rights" are adjudicated, "in contradistinction to those where equitable rights alone were recognized, and equitable remedies were administered." *Parsons* v. *Bedford*, 3 Pet. 433, 447 (1830) (opinion for the Court by Story, J.).

History informs the distinction between law and equity. At the founding, courts were principally divided into common-law courts and equity courts.[1] Common-law courts could "entertain suits only in a prescribed form, and they

_____

[1] England maintained separate law and equity courts until 1875, while in America, many States initially established separate equity courts before some began to fuse law and equity in the mid-19th century. S. Bray & E. Sherwin, Remedies: Cases and Materials 424, 426, 439 (4th ed. 2024). The federal district courts adjudicated claims under law and equity separately until the adoption of the Federal Rules of Civil Procedure in 1938. *Id.*, at 439–441.

[could] give a general judgment only in the prescribed form." 1 J. Story, Equity Jurisprudence §27 (13th ed. 1886) (Story). Equity courts, by contrast, could "give relief in *extraordinary* cases, which are *exceptions* to general rules." The Federalist No. 83, p. 505 (C. Rossiter ed. 1961) (A. Hamilton) (some emphasis deleted; footnote omitted).

Equity courts thus provided different remedies from law courts. The "essential characteristic of Equity procedure . . . is that it begins with a petition . . . to secure justice where it would not be secured by the ordinary and existing processes of law." G. Adams, The Origin of English Equity*,* 16 Colum. L. Rev. 87, 91 (1916); see also L. Smith, Common Law and Equity in R3RUE, 68 Wash. & Lee L. Rev. 1185, 1195 (2011) (describing the core use of equity as a "case where the plaintiff has a legal right and yet goes to Equity for some remedy that the common law cannot provide"). So, for example, common-law courts could find a breach of contract and provide the general legal remedy to the harmed party, "damages for the breach." 1 Story §30. But, when traditional legal remedies would be inadequate, equity courts could provide more exceptional relief to maintain the status quo or ensure fairness, such as by compelling specific performance of the contract or issuing an "injunction to prevent wrongs." *Ibid.* And, consistent with equity's "aim of exact justice," S. Bray, Punitive Damages Against Trustees? in Research Handbook on Fiduciary Law 213 (D. Smith & A. Gold eds. 2018), "it is against the general principles of equity to aid in the enforcement of penalties or forfeitures," 2 Story §1494. In short, equity provided exceptional relief tailored to the unique circumstances of the harmed party to achieve fairness when the remedies available at law were inadequate to do so. See 1 Story §§27–33, 59, 76; S. Bray, Equity, Law, and the Seventh Amendment, 100 Texas L. Rev. 467, 485, 488–489 (2022).

The Seventh Amendment guarantees a jury trial for "the sort[s] of suit[s] historically adjudicated before common-law

courts," but not for "the stuff of equity . . . jurisdiction." *SEC* v. *Jarkesy*, 603 U. S. 109, 151 (2024) (GORSUCH, J., concurring). When parties seek (among other things) money damages, monetary relief in legal restitution, or monetary penalties, they seek "prototypical" legal relief and are entitled to a jury trial under the Seventh Amendment. *Id.*, at 123 (majority opinion). By contrast, when parties seek particular remedies that merely "return unjustly obtained funds" or "'restore the status quo,'" such as an accounting for profits or an injunction, they seek equitable relief beyond the scope of the Seventh Amendment. *Ibid.*

### B

When the SEC seeks "disgorgement" under the Exchange Act, it seeks a legal remedy. §78u(d)(7); see also §78u(d)(3)(A)(ii).

SEC disgorgement does not resemble any traditional equitable remedy. It does not correspond to the most common forms of equitable relief that involved returning money—constructive trusts and equitable liens. Those restitutionary remedies require plaintiffs to trace their original property to "particular funds or property in the defendant's possession," which neither the SEC nor victims of securities fraud can generally do. *Great-West Life & Annuity Ins. Co.* v. *Knudson*, 534 U. S. 204, 213 (2002).

Nor does SEC disgorgement correspond to the "accounting for profits" equitable remedy, as some have argued. That remedy more broadly entitles the plaintiff to the defendant's profits from the "use of" the plaintiff's property without requiring him to trace his original property to the property that he seeks to recover. *Id.*, at 214, and n. 2. But, unlike SEC disgorgement, an accounting for profits is fundamentally "transitive" and involves "an accounting by A to B" for the profits A obtained with B's property. Bray, Fiduciary Remedies 454. It traditionally was limited to cases in which a fiduciary misused his principal's properties or in

which the plaintiff had a trust-like interest in the funds
sought. See 3 J. Pomeroy, Equity Jurisprudence §1421
(1883); J. Eichengrun, Remedying the Remedy of Account-
ing, 60 Ind. L. J. 463, 468, 482 (1985). Recognizing these
limits, one treatise explained that generally bank custom-
ers could not even seek an accounting in equity from their
bankers because the relationship was not a fiduciary one.
E. Merwin, Equity and Equity Pleading §582 (1895). SEC
disgorgement is even further afield from equity: The wrong-
doer is not necessarily or even ordinarily the victim's fidu-
ciary, and he does not surrender to his victim the profits he
made by unlawfully taking advantage of them. Instead, he
disgorges them to the SEC, a Government enforcement
agency that has no fiduciary or trust-like relationship with
the wrongdoer.

Disgorgement more closely resembles legal restitution
than any equitable remedy. In common-law courts, plain-
tiffs could invoke the writ of assumpsit to "'impos[e] a
merely personal liability upon the defendant to pay a sum
of money,'" even when the plaintiff could not "'assert title
or right to possession of particular property.'" *Great-West
Life*, 534 U. S., at 213; see *Moses* v. *Macferlan*, 2 Burr. 1005,
1012, 97 Eng. Rep. 676, 681 (K. B. 1760). Legal restitution,
unlike equitable restitution, does not purport "to restore to
the plaintiff particular funds"; it instead vindicates the
plaintiff's "'just grounds for recovering money to pay for
some benefit the defendant had received.'" *Great-West Life*,
534 U. S., at 213–214. The SEC has no prior claim to own-
ership of or an interest in the defendant's funds; instead,
the SEC takes money from the defendant based on his un-
just profit at *investors'* expense. Thus, the disgorgement
that the SEC seeks today looks more like legal restitution,
for which the Seventh Amendment entitles the defendant
to a jury trial.

Congress's decision to enumerate disgorgement as a rem-
edy in the Exchange Act further suggests that it is now a

legal remedy. As Judge Smith explained, "explicitly authorizing a remedy in a statute's text" is generally "inconsistent with that remedy's being rooted in equity," as the "historical role for equity" was providing relief where law did not. *Hallam*, 42 F. 4th, at 340. In fact, the core of equity jurisdiction involves cases "where a plain, adequate, and complete remedy cannot be had" through law. 1 Story §33; see §61; S. Bray & P. Miller, Getting Into Equity, 97 Notre Dame L. Rev. 1763, 1764 (2022) (describing equity as "patching holes" in the system provided by law). Section 78u(d)(7) now expressly provides for disgorgement, so granting that remedy is hardly filling a remedial gap left by the law.

The statutory structure confirms that Congress provided for disgorgement as a legal remedy in other ways, too. The statute now "twice distinguishes between disgorgement and equitable remedies." *Hallam*, 42 F. 4th, at 339. In §78u(d)(5), the Act authorizes "any equitable relief," but two subsections later, §78u(d)(7) provides for "disgorgement," which would be entirely superfluous if disgorgement were a kind of equitable relief. And, in §78u(d)(8), the Act specifies one limitations period for actions seeking disgorgement and another for actions seeking "any equitable remedy." "The obvious implication is that 'disgorgement' is not 'equitable relief.'" *Hallam*, 42 F. 4th, at 340.

It makes sense that Congress made disgorgement a legal remedy after *Liu*. Although *Liu* characterized disgorgement as an equitable remedy, it left the requirements for disgorgement unclear. And, because "[d]isgorgement is not a traditional form of equitable relief," lower courts could not rely on historical practice for guidance in implementing the remedy this Court recognized. 591 U. S., at 94 (THOMAS, J., dissenting). Instead, lower courts could resort only to the language in *Liu* itself, which raised more questions than it answered: *Liu* defined disgorgement as "a remedy that compels each defendant to pay his profits (and sometimes,

though it is not clear when, all of his codefendants' profits) to a third-party Government agency (which sometimes, though it is not clear when, passes the money on to victims)." *Id.*, at 94–95. Given this vague definition and the doctrine's lack of foundation in equity practice, Congress unsurprisingly responded seven months later by simply turning disgorgement into an enumerated legal remedy.

Not even the SEC still treats disgorgement as an equitable remedy. To be sure, the SEC maintains that disgorgement is equitable in the hope of continuing to avoid jury trials. Tr. of Oral Arg. 59–62, 75–77. But, the SEC plainly uses disgorgement to collect forfeitures or penalties, even though doing so violates "the general principles of equity." 2 Story §1494; see *Bangor Punta Operations, Inc.* v. *Bangor & Aroostook R. Co.*, 417 U. S. 703, 717–718, n.14 (1974). In 2024, the SEC obtained orders to disgorge $6.1 billion, while it returned only $345 million to victims. See Brief for Investor Choice Advocates Network as *Amicus Curiae* 20–21.[2] It is difficult to see such a practice as anything other than a fines regime, an inherently legal process. See *Jarkesy*, 603 U. S., at 123.[3] The Court appropriately emphasizes that, so long as the SEC continues to seek disgorgement in equity, this practice must change. *Ante,* at 12–13. In a future case, however, we should address whether the SEC should be able to continue seeking disgorgement in equity at all. As it stands, disgorgement

---

[2] At oral argument, the SEC explained that less than $6.1 billion was ever collected, though it could not say how much was collected. Tr. of Oral Arg. 66–67. The SEC also suggested that 88 percent of the disgorged funds that are collected get designated for distribution, though it admitted that "doesn't mean it would necessarily have been distributed at the end of the day." *Id.*, at 67.

[3] Disgorgement also appears to be a "coercive penalty for a public wrong," so it would have been understood at the founding as "'punishment' for a 'crime'" for constitutional purposes. *Ellingburg* v. *United States*, 607 U. S. 163, 169 (2026) (THOMAS, J., concurring).

bears all the hallmarks of a legal remedy that requires a jury trial.

## C

The counterarguments for permitting the SEC to continue seeking disgorgement without a jury trial are unpersuasive.

First, the SEC argued in this case that because disgorgement does nothing more than divest ill-gotten gains, it is "not a penalty and no Seventh Amendment right attaches." Tr. of Oral Arg. 62. The SEC's conclusion does not follow from its premise that disgorgement is not a penalty. Many legal remedies that require jury trials under the Seventh Amendment are not penalties. Plenty of traditional remedies, such as relief in quasi-contract, replevin, or assumpsit, are plainly "legal" in nature, even though they provide restitution and are not penalties. See *Great-West Life*, 534 U. S., at 213, 215.[4] In fact, the quintessential legal remedy requiring a jury trial—compensatory damages—is not a penalty at all; it simply makes the plaintiff whole for injuries that he should not have suffered in the first place. And, in any event, as the Court points out, there are substantial reasons to conclude that SEC disgorgement functions as a penalty. *Ante,* at 12–13.

Second, the SEC suggested that even if Congress authorized a legal disgorgement remedy in §78u(d)(7), the SEC can still seek equitable disgorgement under §78u(d)(5)'s provision for "any equitable relief." See Tr. of Oral Arg. 53–54, 69–70, 73–75. Disgorgement is not in fact a "traditional equitable remedy," so there is no such thing as equitable

---

[4] See also Bray & Sherwin 457; C. Roberts, Restitutionary Disgorgement for Opportunistic Breach of Contract and Mitigation of Damages, 42 Loyola (LA) L. Rev. 131, 137 (2008); L. Keele, Only Mostly Dead: How the Irreparable Injury Rule Can Protect the Jury Trial Right for Claims in Restitution, 77 Okla. L. Rev. 569, 593–594 (2025).

disgorgement under §78u(d)(5). *Liu*, 591 U. S., at 93 (THOMAS, J., dissenting).

But, even taking *Liu*'s interpretation of the pre-2021 statute as a given, Congress has amended it. It explicitly separated disgorgement into its own subsection with its own statute of limitations, set apart from the general authorization for equitable relief. That drafting choice suggests that Congress enacted a specific legal regime to control disgorgement going forward. Cf. A. Scalia & B. Garner, Reading Law 183 (2012) (general/specific canon). With the latest amendments to the Exchange Act, it seems that Congress simply "reclassif[ied] the SEC's restitutionary remedy as legal." S. Bray, The Changing Face of the SEC Restitution Remedy, Volokh Conspiracy (Jan. 7, 2021), https://reason.com/volokh/2021/01/07/the-changing-face-of-the-sec-restitution-remedy/ (archived at https://perma.cc/M94T-YY3W). The SEC's current practice reflects this same understanding, as it keeps a significant portion of the disgorged profits as a forfeiture, which is flatly inconsistent with the equitable requirements that §78u(d)(5) would impose.

## III

We will soon need to address whether disgorgement under §78u(d)(7) is a legal remedy. The Circuits have already split on the answer. Compare *Hallam*, 42 F. 4th, at 341, with *SEC* v. *Ahmed*, 72 F. 4th 379, 395 (CA2 2023). In my view, disgorgement is a legal remedy.